# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

CHRISTINE A. LYNCH,

       Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

No. C08-4090-MWB

**REPORT AND RECOMMENDATION**

---

## I.  INTRODUCTION

The plaintiff Christine A. Lynch seeks judicial review of a decision by an administrative law judge ("ALJ") denying her applications for disability insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and Supplemental Security Income ("SSI") under Title XVI of the Act.  Lynch claims the ALJ erred in finding her subjective complaints not to be entirely credible, and in determining that she retains the residual functional capacity to work.  *See* Doc. No. 10.

## II.  PROCEDURAL AND FACTUAL BACKGROUND
### A.  Procedural Background

On May 10, 2005, Lynch filed applications for DI and SSI benefits, alleging a disability onset date of September 1, 2004. (R. 65-69, 353-57)  She claims she is disabled due to hepatitis C, peripheral edema, and chronic pain.  She claims she suffers from severe swelling in her feet after standing for any length of time, back pain, and abdominal pain. (R. 82-83)

Lynch's application was denied initially and on reconsideration.  Lynch requested a hearing, and a hearing was held on May 4, 2007, before an Administrative Law Judge ("ALJ").  (R. 370-408)  Lynch was represented at the hearing by attorney David Scott.

Lynch testified at the hearing, and Vocational Expert ("VE") William Tucker also testified. On August 28, 2007, the ALJ found that although Lynch suffers from severe impairments and cannot return to any of her past relevant work, she retains the functional capacity to perform other work, and she therefore is not disabled. (R. 12-36) Lynch appealed the ALJ's ruling, and on August 22, 2008, the Appeals Council denied her request for review (R. 5-7), making the ALJ's decision the final decision of the Commissioner.

Lynch filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 2) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. Lynch filed a brief supporting her claim on March 6, 2009. (Doc. No. 10) The Commissioner filed a responsive brief on May 21, 2009. (Doc. No. 13) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Lynch's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Lynch's hearing testimony

Lynch was thirty-five years old at the time of her hearing. She was 5'5" tall and weighed 268 pounds. She stated her weight was down ten pounds because she had begun some type of thyroid treatment. She was not on any type of weight management program, and according to her, no weight management program had ever been recommended for her. As of September 2004, she weighed about 230 pounds. (R. 374, 387-388) According to her, no doctor has ever told her that she is diabetic, or that she has any health complications caused by her body weight. (R. 390)

Lynch is divorced, and at the time of the hearing, she was living in a farmhouse in Spencer, Iowa, with her boyfriend and one of her three children, who was fourteen years

old at that time. (*Id.*) Two other children, then ages ten and thirteen, lived with their father. (R. 387) Lynch's boyfriend and son did most of the cooking and cleaning in the residence. (R. 393)

Lynch graduated from high school in 1990. In 1994, Lynch worked as a credit analyst at Sears Credit Central in Des Moines, a job she held for ten months. She took general business courses at the American Institute of Business for a year-and-a-half in 1994 and 1995. When she started school, she went from working full time to working part time. She worked for Sears again briefly in 1998, through a temporary agency. (R. 110, 375, 403-04) In 1995, she worked as an office assistant doing computer programming. (R. 110) Besides these two sedentary positions, Lynch worked from 1990 to 2003, at various other jobs including cashier at convenience stores, cooking at fast food restaurants and at a nursing home, housekeeper in a hotel, factory laborer, nurse's aide in a nursing home and an assisted living facility, and fast food waitress. (R. 110) At the time of the hearing, Lynch was working eight to twelve hours a week as a cashier at a gas station, a job she had held for five or six months. Her work hours were spread out over two to four days each week. She was paid $7.00 per hour. (R. 375-76)

Lynch quit working full time on September 1, 2004, because of "[p]ain and moodiness due to the pain." (R. 83) She had begun having problems with back pain, and her right leg "wasn't functioning correctly[.]" (R. 378) Her leg was "swelling and causing a lot of pain," and her feet would go numb and tingle. The problems worsened the longer she stood. (*Id.*) Her part-time job in 2007 required her to stand, and she still had times when her legs "flared up" and she had to stay home from work. (R. 391)

Lynch does not believe she could return to any of her past work, or that she could tolerate an increase in her hours as a cashier or clerk. (R. 387) However, she stated that if a job existed that met her functional capacities as found during her Functional Capacity Evaluation ("FCE"), she could work. (R. 396)

Initially, Lynch's primary treating medical professional was physician's assistant Denise Hemphill in Hartley, Iowa. P.A. Hemphill referred Lynch to Iowa City for an evaluation of her peripheral edema and back pain, but doctors in Iowa City were not able to determine a cause for the edema. Subsequently, Lynch began seeing Sherry Kolacia-Tighe, M.D. in Spencer, Iowa, who diagnosed Lynch with lymphedema. (R. 379-80) At the time of the ALJ hearing, Lynch was seeing Dr. Tighe twice a week for regular lab tests, monitoring, and follow-up of physical therapy prescribed by the doctor. (R. 381) Lynch stated the swelling in her right leg had improved since she started physical therapy. (*Id.*)

In the spring of 2007, Lynch's left leg also began swelling. She estimated she can stand on her feet for no more than ten to fifteen minutes at a time. She has constant leg pain, regardless of whether she is sitting or standing, and her legs swell even when she is wearing support socks. (R. 382-83) She has a formed wrap and bandage that she uses when the swelling gets "out of control," and she also uses the wrap every night to compress her leg. (R. 383)

Lynch stated she is unable to do any bending at all. If she drops something and is sitting down, she sometimes "can roll it up [her] leg." (R. 384) She also has problems with her hands tingling and going numb. She stated she was diagnosed with carpal tunnel syndrome in early 2007, and she has wrist braces that she wears at night. However, no doctor has suggested she have surgery or has advised her to limit her activities due to the condition. (R. 384-85) According to Lynch, an orthopedic doctor in Sioux Falls, South Dakota, diagnosed her with osteoarthritis in her hips and back, and carpal tunnel syndrome in her hands. After the consultation, she was fitted for splints by her treating doctor, but no other treatment has been suggested or attempted. (R. 385)

Lynch is on several medications, but she stated none of them causes side effects that would prevent her from working, although some of them make her mouth dry and make her a bit drowsy. (R. 386) She is on an antidepressant prescribed by Dr. Tighe, and she

went to a mental health center a couple of times after her mental health evaluation by a Social Security consultant. (R. 392) She has never been admitted to a hospital due to mental health problems, and she does not see a psychologist or psychiatrist. (R. 393)

Lynch was involved in an automobile accident in 2006, in which she reinjured her neck and spine. She was treated by a chiropractor. (R. 386-87)

## 2. *Lynch's medical history*

On June 28, 2004, Lynch saw a physician's assistant with complaints of right foot and leg swelling and pain for several days with no precipitating injury. She stated the pain bothered her at night but was much worse during the day. Notes indicate Lynch's right ankle was quite swollen and tender to the touch, with pitting edema of both the foot and ankle. X-rays were normal. The doctor prescribed Vioxx, and directed Lynch to return in two weeks if the condition did not improve. (R. 224)

Lynch returned for follow-up on August 16, 2004. She stated her right foot and ankle were still quite painful, and she had been off work for several days due to the pain. The swelling and pain were somewhat improved but had never resolved, and she stated her ankle would change color from white to red. She also complained of periodic pain in the pelvic region, and some urinary hesitancy at times. (R. 222) An ultrasound and abdominal x-rays were largely unremarkable. (R. 220) She was referred to a doctor in the same clinic, and she saw the doctor the next day. She was scheduled for abdominal and pelvic CT scans, which also were unremarkable. (R. 222-23)

Lynch was seen on October 1, 2004, for follow-up of her peripheral edema and pain. She continued to complain of significant pain when she was standing on her leg, and she also had developed a burning sensation in the lateral thigh of her left leg. Notes indicate that multiple tests had come back normal and doctors could not determine the cause of Lynch's edema. Notes further indicate Lynch was frustrated because the problem had persisted for four months; however, Lynch was "not good about follow-up" and had

"missed at least 2 appointments since August." (R. 220) Lynch was not working, and the physician's assistant felt Lynch had come in primarily "to get a note saying that she can't work." (*Id.*) She was referred to the University of Iowa for a full workup. (*Id.*)

On December 7, 2004, Lynch was seen at the University of Iowa Hospitals and Clinics for evaluation of her complaints of abdominal pain and heartburn. (R. 203-06) Previous gynecological testing and procedures had failed to reveal the source of her pain. (*See* R. 190-91, 207-09) She described the pain as "stabbing, crampy, and occasionally dull discomfort." (R. 204) She denied that the pain was relieved by moving her bowels, and she indicated the pain sometimes was worse with eating and with movement. She underwent a colonoscopy and upper endoscopy on December 14, 2004, both of which were normal. (R. 199) However, liver function tests were elevated, indicating the presence of the hepatitis C antibody. She was scheduled to be seen in the Liver Clinic for further evaluation. (R. 202)

On January 19, 2005, Lynch was seen in the Liver Clinic for evaluation of her elevated liver function tests. Notes indicate Lynch had a history of IV drug use, with her last use of drugs two days prior to the exam. Lynch complained of chronic pelvic pain that worsened when eating and with movement, and improved with sitting still. She also complained of a history of swelling in her left foot for several months. She reported smoking one pack of cigarettes daily for sixteen years, and drinking occasionally at social functions. Doctors recommended Lynch abstain from all alcohol and drug use, noting she needed to be abstinent for six months before she could be treated for hepatitis C. (R. 192-93)

Lynch saw a doctor on March 22, 2005, with complaints of right lower extremity pain and right foot swelling. She stated she had noticed the swelling upon removing her shoes one day after work. Pain in her leg gradually increased over time, and she stated she had been unable to work for four months due to the pain. She experienced pain primarily from her ankle to her knee, occasionally traveling up to her groin area and into

her low back. The pain was worse when she stood or walked, and when she sat for any length of time. She also complained of occasional pain, numbness, and tingling in her left lateral thigh. She reportedly had tried Ted hose and various medications with little success. X-rays and lab work were scheduled, and she received a prescription for a nicotine patch to assist her with smoking cessation, and medications for gastritis and allergies. (R. 186-87)

Lynch was seen for follow-up of her right lower extremity pain and swelling on April 12, 2005. (R. 180-83) X-rays of her lumbar spine were normal, and an MRI was recommended to evaluate her for spinal stenosis. She was continued on amitriptyline for "possible neuropathic pain secondary to hepatitis C." (R. 182)

Lynch underwent a needle core biopsy of her liver on April 13, 2005, that resulted in a diagnosis of chronic hepatitis C with mild portal and focal central fibrosis. (R. 168) On April 15, 2005, she underwent a biopsy of her duodenum to rule out celiac disease. (R. 169) She was seen on April 28, 2005, for follow-up of her hepatitis C. She complained of "diffuse myalgias and joint complaints with pain in her abdomen, leg, back, neck along with headaches." (R. 177) Notes indicate Lynch had "hepatitis C genotype 1A with a high viral load," and "mild fibrosis" of her liver. (*Id.*) Lynch indicated she was using marijuana daily for pain. She had tried a nicotine patch in the past but was not using it currently and was still smoking tobacco. She apparently had abused methamphetamine in the past but she stated her last use was a month earlier. Doctors wanted Lynch to remain abstinent from all recreational drugs for at least six months before commencing treatment for hepatitis C. They also wanted Lynch's pain issues to be addressed prior to beginning Interferon treatment because Interferon could exacerbate her joint pain and myalgias. (R. 177-78)

Lynch was seen on May 17, 2005, for follow-up of her leg pain, back pain, allergies, and abdominal pain. She was sleeping better after starting amitriptyline, but she had experienced no relief from her pain. She complained of "achy pain on the left leg and

more sharp pain on the right leg with both legs having decreased sensation from the midcalf to her feet." (R. 174) She also complained of back pain on waking and with any type of activity. Her amitriptyline dosage was increased for her diagnosis of peripheral neuropathy. She was given a prescription for the muscle relaxer Kelaxin, the only muscle relaxer that had worked for her in the past, but notes indicate the drug was not covered by state assistance and Lynch would have to fill it out-of-pocket if she so desired. She also was given a prescription for Zyrtec for her allergies, and she was encouraged "to eat less fatty foods and more whole fruits and vegetables and whole grains." (R. 174-75)

Lynch was seen on June 21, 2005, for follow-up of her complaints of leg pain, back pain, and abdominal pain. She stated her back pain was mildly better since she had started taking Flexeril, but she had no increase in her ability to function. She complained of ongoing leg and foot pain, worse on the right, and she stated she was unable to move her toes as well as she could previously. She also had decreased sensation from mid-calf to her feet on both legs, and a numb patch on her left thigh. Lynch stated the numbness and pain in her legs caused her to "walk differently," and she indicated she could not walk very fast or she would fall. The doctor opined Lynch likely had idiopathic peripheral neuropathy, and he planned to order an MRI to rule out disc protrusion and nerve root impingement. (R. 172-73)

Lynch also stated her abdominal pain was somewhat improved, but she continued to feel bloated. Notes indicate she had failed to implement doctors' suggestion that she eat less meat and fat. She again was advised to increase the fiber in her diet and decrease fat and protein. (*Id.*)

X-rays and an MRI were performed on June 29, 2005, of Lynch's lumbar spine in connection with her ongoing complaints of bilateral leg pain. No abnormalities of Lynch's lumbar spine were revealed by the studies. (R. 167, 171)

On July 13, 2005, J.D. Wilson, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. (R. 132-38) Dr. Wilson noted Lynch had

"chronic moderately active Hepatitis C with mild fibrosis," and a history of substance abuse currently in early remission. (R. 133) He noted Lynch had abdominal pain, and left leg pain with peripheral edema that had to be controlled before Interferon therapy could be instituted. He also noted Lynch had upper quadrant pain that likely was "a dietary issue," and he indicated Lynch's doctor had advised her to consume "more fiber and less meat," a recommendation Lynch had not yet followed. (R. 133-34) Dr. Wilson opined that Lynch's impairments were severe but not disabling, and he opined she would be able to lift/carry twenty pounds occasionally and ten pounds frequently; stand and/or walk, and sit, for about six hours each in an eight-hour workday with normal breaks; and perform all postural activities occasionally with the exception of climbing ladders, ropes, or scaffolds, which she should avoid due to her leg pain and loss of sensation in the lower part of her legs. (R. 132-38)

On September 29, 2005, Lynch was seen at the University of Iowa for follow-up of her lower extremity and back pain. (R. 163-65) She reported worsened pain in her right leg with increased difficulty of movement. She reported that amitriptyline was not helping her pain much, but she continued to take 100 mg at bedtime. Notes indicate the doctor wanted to prescribe gabapentin but it was not covered by Iowa Care, and Lynch could not afford to purchase the medication independently. (R. 164) She was continued on amitriptyline. (*Id.*)

Another paper review was performed on October 29, 2005, by Jan Hunter, D.O., in connection with Lynch's request for reconsideration. (R. 139-47) Dr. Hunter found that since the July 2005 assessment, Lynch's ability to stand and/or walk had been compromised due to her ongoing lower extremity pain. Accordingly, Dr. Hunter reduced the amount of time Lynch could stand/walk to two hours in an eight-hour workday. Otherwise, the assessment was identical to the one done by Dr. Wilson.

Lynch returned to the Liver Clinic in Iowa City for follow-up on November 2, 2005. She reportedly had been off alcohol for two years, and off methamphetamine for

six to seven months. She still used marijuana about once a week. She continued to have pain in her ankles, fingers, and left thigh, and some numbness in her feet. In addition, she was experiencing some nausea since she had to stop taking Prevacid due to lack of prescription coverage. The treatment protocol for hepatitis C was reviewed with Lynch, and she was tentatively scheduled to begin treatment for hepatitis C on November 21, 2005. She was given prescriptions for Pegasys and ribavirin. She was instructed to check with Iowa Care to see if the medications were covered, and if they were not, to contact the clinic. (R. 349-50) Lynch called the clinic on November 4, 2005, to report that the hepatitis C treatment had been approved through Iowa Care. (R. 348)

On November 17, 2005, Lynch underwent a psychiatric evaluation by Paul Dean Anderson, D.O. at the request of the state agency. Notes indicate Lynch had never seen a psychiatrist before, and she was "the sole source of information for this evaluation." (R. 210) Dr. Anderson noted Lynch did not appear to care for herself well, and she appeared older than her age of 33. She was tearful throughout the interview, and complained of fatigue. The doctor observed that Lynch tried "to minimize her symptoms, as she wants to get the interferon treatment and knows that depression might keep her from that for a period of time." (R. 212) Lynch described her typical day as follows:

> An average day consists of the patient getting up between 4 a.m. and 6 a.m. She sits on the couch and contemplates going back to sleep, generally, then she gets a soda and a cigarette, checks the weather on the weather channel, lets her cats out, feeds them, may do some laundry, watches TV, does dishes during commercials. Her boyfriend pays all the bills and helps her with housework. She fixes meals. She is in bed around 10 p.m., actually not in bed, yet she falls asleep before 10, generally on the couch, and gets up by midnight to go to bed.

(R. 211) Dr. Anderson diagnosed Lynch with Major depression, single episode; PTSD, chronic and delayed; and Borderline Personality traits. He assessed her current GAF at 35.[1]

On November 21, 2005, Lynch started treatment for hepatitis C using Pegasys and ribavirin. (R. 343)

On December 6, 2005, Beverly Westra, Ph.D. reviewed the record and completed a Psychiatric Review Technique form. (R. 148-62) She found Lynch to have no severe mental problems that would affect her ability to work. (*Id.*)

Lynch was seen for follow-up of her hepatitis C treatment on January 11, 2006. She was experiencing some ongoing side effects from the treatment including intermittent nausea and stomach pain, occasional vomiting, intermittent fevers, mood fluctuations, rash and hives, disrupted sleep, and some site reactions from the Pegasys injection. Her appetite was fair and her weight was remaining stable. She was meeting with a counselor weekly and with a psychiatrist monthly. Testing indicated Lynch's liver enzymes had improved somewhat. She had developed anemia, and she was instructed to contact the clinic if she became symptomatic from the anemia. She was given prescriptions for the rash and itching, and she was directed to return for follow-up in one month. (R. 343-44)

Lynch was seen the same day for follow-up of pain management. Lynch complained of chronic pain in her lower and mid back, and "a twisting sensation in the lower extremities on the right in particular, a tingling sensation[.]" (R .341) She stated her psychiatrist had started her on Cymbalta a few days before this visit. On examination, Lynch exhibited "pretty significant palpable tenderness throughout the whole back region," and she was "very reluctant to flex or extend or lateral movements due to discomfort." (*Id.*) She was able to heel and toe walk, and her lower extremity sensation, muscle

---

[1] A GAF of 35 indicates "some impairment in reality testing or communication or major impairment in several areas such as work, family relations, and judgment." *Bartrom v. Apfel*, 234 F.3d 1272 (Table), 2000 WL 1412777, at *1 n.3 (7th Cir. Sept. 20, 2000).

strength, and patellar reflexes were normal. The doctor opined that Lynch's tightness in her back was due to lack of movement, and she was encouraged to do stretching. She was given a prescription for muscle spasm and discomfort. She also was encouraged to continue using the Cymbalta, which notes indicate "was an excellent choice in terms of treatment of low mood as well as chronic pain." (*Id.*)

Lynch returned for follow-up of her hepatitis C on February 28, 2006. Notes indicate Lynch traveled to her appointments "using the hospital car," which was covered by Iowa Care, and a problem with the hospital car scheduling had prevented her from returning for a scheduled appointment a few weeks earlier. As a result, she had run out of her hepatitis C medications about three weeks before this visit. Lynch complained of ongoing problems with dry skin, itching and pruritus on her abdomen and legs, and sleep disruption. She denied changes in her appetite and indicated her mood had been "fine," with no depression or "feeling down." (R. 337) She continued to smoke but was down to less than one pack per day, and she continued to use marijuana once or twice per week. On examination, Lynch exhibited mild diffuse tenderness of her abdomen, with no other remarkable findings. Her hepatitis C medications were refilled, and she was scheduled for monthly follow-up visits to evaluate her response to the therapy. (R. 338)

On March 1, 2006, Lynch was seen in the Pain Clinic in Iowa City for evaluation and treatment of her widespread pain complaints. Lynch stated she had had pain since a car accident in 1990. She described her pain as follows: "back pain as a constant pressure located in the lower back and shoulder. Leg pain is numbness and shooting. Left leg burning and tingling in the upper thigh." (R. 334) She rated her pain at six on a ten-point scale. She had tried a number of medications without any lasting success, and she currently was taking a muscle relaxer and Doxepin. Doctors added Salsalate to her medication regimen. (*Id.*)

Lynch was seen for follow-up in the Pain Clinic on July 25, 2006, following a motor vehicle collision that occurred on July 21, 2006. She initially had thought she was

not injured but since that time had been experiencing "increasing pain in her neck, radiating down her back and into her shoulders and arms bilaterally." (R. 331) She also had an abrasion over her left neck from her seatbelt. She had stopped taking Doxepin when she ran out of the medication. On examination, Lynch exhibited "limited range of motion in the neck in all directions due to pain," and "diffuse tenderness to palpation over her musculature of the neck." (*Id.*) Her gait was noted to be "slightly antalgic to the left." (R. 332) She was diagnosed with a cervical neck strain and possible contusion. A CT scan of her neck ruled out any fracture. (*Id.*) She received a refill of Salsalate and the muscle relaxer. (*Id.*)

Lynch returned for follow-up of her chronic pain on August 30, 2006. Lynch indicated she had "missed her last few appointments because . . . she was just fed up with having to come to Iowa City so much." (R. 328) Lynch stated her pain had worsened and the only medication that was helpful was Darvocet. She indicated the Salsalate had no effect on her pain. Her prescriptions for amitriptyline, Doxepin, and the muscle relaxer were renewed, and Piroxicam, an NSAID, was added to her regimen. (*Id.*) X-rays of her lumbar spine and right foot were negative for any abnormalities, although some soft tissue swelling was present in her foot over the dorsum. (R. 329) Her liver function tests were normal. (R. 326)

Lynch was seen for follow-up in the Liver Clinic on September 26, 2006. Notes indicate Lynch's hepatitis C treatment was discontinued because she had failed to return for scheduled follow-up visits and had been noncompliant for several weeks. (R. 322) In any event, her liver enzymes were normal in August 2006, indicating her treatment had been successful. Lynch was not having any problems with abdominal pain, nausea, vomiting, rashes, or bleeding/bruising easily. She had some edema in her right foot. Lab tests were ordered to see if she continued to have any detectable virus, and Lynch was instructed to call the clinic in two weeks to obtain her test results and discuss whether further treatment was indicated. (R. 323)

Lynch also was evaluated in the Pain Clinic on September 26, 2006.  She continued to complain of pain in her back, right leg, and foot.  She reported some relief from the Piroxicam, and that prescription was renewed along with the muscle relaxer.  Doctors also recommended she begin water therapy, and they gave her "a note to bring to some local pools to see if they can give her a discount there."  (R. 320)

Lynch was seen in the Orthopaedics Clinic on November 7, 2006, for evaluation of her low back pain.  She indicated she had not followed through with the pool exercises because she had no access to a pool.  She reported pain throughout her low back, buttocks, and into both thighs, and weakness and swelling in her right leg.  She indicated her symptoms were "constant irrespective of sitting, standing, walking, or lying down."  (R. 318)  Lynch stated she was working "40 hours a week cleaning houses."  (*Id.*)  Lynch "was instructed in lumbar stabilization exercises involving both flexion and extension strengthening and motor control."  (R. 319)  She was instructed to do the exercises for one to two months, progressing gradually as tolerated.  (*Id.*)  She also was seen in the Pain Clinic, where her medications were reviewed and gabapentin was added to her regimen.  She was encouraged to do the aqua therapy, and if she had no access to a pool, to do stretching exercises in a hot shower or tub to increase her ranges of motion.  (R. 315-16)

Lynch underwent a Functional Capacity Evaluation ("FCE") on April 17, 2007.  (R. 287-308)  The evaluator found Lynch could never squat or bend.  She could lift up to thirteen pounds occasionally, six pounds frequently, and two pounds constantly at waist level, which would apply to sedentary positions.  She showed less-than-sedentary ability to lift at shoulder level or overhead, and no ability to lift at the knee level.  She could reach up and out frequently, defined as 34-66% of the day; and bend, walk, and stand for up to one-third of the day.  She had no ability to use her hands for work requiring fine coordination.  (*See* R. 285, 297).  Lynch was deemed to have given maximum effort on all tests and the results of her testing were deemed reliable.  (R. 305)

Regarding Lynch's specific abilities and limitations, the evaluator found the following:

1.     Overall the questionnaires appear consistent with ability with exception of sit ability, which appears underestimated and stand ability appears overestimated. Corresponding to work ability she would be able to sit for up to 53 minutes and reach out or reach up occasionally to frequently. Her stand ability is significantly compromised and would also affect her ability to perform any job that requires standing.

2.     When considering her hand sensation, she displays a diminished protective sensation on the left dorsal and volar surface. Her right hand displays a diminished protective sensation on the volar surface and loss of protective sensation to diminished protective sensation dorsal surface. The degree of diminished sensation would cause a significant impairment when performing fine coordination tasks when looking at the overall picture of sitting, reach up[,] reach out and sensation.

3.     Work ability is further restricted when considering she has no ability to bend or squat. These positions are used when lifting objects from the floor or knee level. She therefore is unable to perform any lifting from the floor or knee level.

4.     Ability to perform any overhead work is restricted to 2 minutes. She was not able to meet the testing time of 5 minutes. Again, when looking at her hand sensation combined with her limited overhead activity level, she is impaired with this ability.

5.     Results of fine coordination testing also verifies an inability to use her hands in a job that requires assembly or production work. She falls well below the normative population. Noted there was a ready response noted and an increase in attempted speed when comparing practice verses actual testing indicating good effort.

6.     Results of grip testing indicates she has a normal strength when compared to the normative population. Gripping of an object typically also involves some form of manipulation of the object also. The manipulation of any object would be affected secondary to her sensation.

7. Pinch ability falls in the same category, i.e. she has a normal pinch but would be restricted with manipulation of an object secondary to decreased sensation.

8. Individual could benefit from use of adaptive equipment to perform basic living skills. She could use a reach to pick up objects from the floor, use a bath sponge to bathe herself, and a dressing stick to assist with dressing/undressing. This is due to her inability to bend or squat and would increase safety in and around the home.

(R. 285-86) In summary, the evaluator indicated Lynch's testing indicated "a current work capacity characterized by the less than Sedentary Physical Demand Level for work above the waist and the No Ability Physical Demand Level for work below the waist." (R. 285)

On January 15, 2007, Lynch saw Sherry Tighe, M.D. at Milford Family Care for establishment with this local physician after qualifying for Title XIX assistance. She reported her current medications as Cyclobenzaprine (a muscle relaxant), 40 mg two to three times daily as needed, with her only side effect being dry mouth; Loratadine for allergies; Neurontin 300 mg three times daily "for neuralgia related to her back pain"; amitriptyline, 75 mg at night, for insomnia; and Piroxicam, an NSAID, 20 mg as needed for pain. (R. 276) Dr. Tighe reduced Lynch's muscle relaxant dosage to 20 mg up to four times daily, because the doctor "was concerned about oversedation and side effects." (R. 277) She planned to obtain Lynch's records from Iowa City before ordering further testing or prescribing other medications. She noted Lynch "describes that she has significant pain an[d] no one quite understands how severe in pain she is, although her examination shows fairly well preserved range of motion." (*Id.*)

Lynch saw a physician's assistant in the Milford clinic on February 16, 2007, complaining of right foot pain, and sinus tenderness and discomfort. Notes indicate Lynch was "independently employed as a housecleaner." (R. 274) Lynch reported that despite Dr. Tighe's recommendation that she cut back on her muscle relaxer, she had continued taking 20 mg up to four times daily, as well as Loratadine, gabapentin, amitriptyline, and

Piroxicam. The P.A. indicated Lynch would "anticipate pain and jerk[]" before even being touched, and she jerked as if in pain when touched with a stethoscope on her back. "She also seem[ed] to have difficulty getting up on the examination table, however, when she [came] down and walk[ed] to the chair that same pain [did] not seem apparent." (*Id.*) Lynch reported pain all over her back on palpation. The P.A. advised Lynch to use proper lifting techniques and to stretch before performing any activities. Lynch was referred to a physical therapist for evaluation. The P.A. also "encouraged her to monitor her blood pressure [and] get off cigarettes[.]" (R. 275) The P.A. then noted the following:

> I offered to refer this patient back to the University of Iowa and she refused that. Worth noting I told her that I would not be responsible for her negative outcomes and that the Flexeril she must cut back. I advised her that at such large doses she could easily be causing difficulties with her liver. This seems to be a somewhat difficult patient in that she seems fairly set on what she wants and I am uncertain if she is actually seeking the Flexeril for herself or possibly someone else. Worth noting, I did not give her any pain medications today and did not give her any narcotics.

(*Id.*)

In a later note on February 19, 2007, after talking with the University of Iowa, the P.A. indicated Lynch was only supposed to take 10 to 20 mg of Flexeril twice daily, instead of the 40 mg two to three times daily that she had been using. The Pain Clinic also reported that they had "suggested lumbar exercises and aerobic walking, aqua therapy, hot showers, stretching, weaning off the Cymbalta and Neurontin," and told Lynch to come back to Iowa City for follow-up in January of 2007, which she had not done. The P.A. noted, "We will want to make sure we coordinate with the University of Iowa and do not contradict the treatment plan as recommended by the University of Iowa and reinforce that." (R. 273)

Lynch saw Dr. Tighe for follow-up on February 23, 2007. Lynch reported that she had noticed only a modest difference since the P.A. had discontinued her Flexeril. She

indicated she might have overstretched during physical therapy and done more damage. Examination of Lynch's back revealed tenderness, especially in her lumbar back, but fairly good range of motion. She also had tenderness in her shoulders, right elbow, hips, and ankle. She was advised to continue with the physical therapy, and the doctor planned to refer Lynch to a rheumatologist to rule out any myofascial type of pain syndrome. (R. 267)

Lynch saw a P.A. on March 8, 2007, with complaints of recurring sinus infection, and possible sleep apnea. Lynch's son "states that she stops breathing and gurgles" during the night, and Lynch experienced a lot of daytime fatigue. (R. 266) She had gained some weight. The P.A. ordered thyroid tests and indicated a future referral for a sleep study might be indicated. (*Id.*)

Lynch returned to see Dr. Tighe on March 19, 2007. Notes indicate Lynch had come to the clinic on March 16, 2007, exhibiting "peripheral 1-2+ pitting edema on the right . . . and was placed on Lasix." (R. 263) Lynch had been referred to a rheumatologist who felt Lynch's back pain was due to "degenerative changes and carpal tunnel," and carpal tunnel splints were recommended. (*Id.*) Lynch was taking Naproxen, Piroxicam, and Cymbalta for pain, and her medications were suspected as a possible cause of her edema. Lynch requested Darvocet or Hydrocodone, but Dr. Tighe was reluctant to prescribe narcotics which she felt could be counterproductive. She prescribed Ultram instead and advised Lynch to start aqua therapy. She also started Lynch on the carpal tunnel splints. (*Id.*)

Lynch called the clinic on March 30, 2007, and spoke to a P.A. Lynch stated she was "in excruciating back pain," and she wanted "a steroid shot into her lower back." (R. 261) She was still attending physical therapy sessions three times weekly, and was cleaning a house. She had been to two sessions of water therapy and felt she needed more pain control. She currently was taking Tramadol, two pills up to three times daily; Tylenol; and Lasix. Lynch stated she had been off work all week from her job at a gas

station.  The P.A. advised Lynch to go to the emergency room if she was in that much pain, and cautioned that she should not be doing a house cleaning job if her back was in that much pain.  The P.A. recommended that Lynch "rest, put her legs up, elevate the knees," take her Lasix faithfully, and return for follow-up with Dr. Tighe.  At that point, Lynch hung up on the P.A.  (*Id.*)

### 3.    *Vocational Expert's testimony*

VE William B. Tucker stated Lynch likely would have gained transferable clerical skills from her work as a credit analyst, which is a skilled occupation.  He stated "there would be clerical kinds of skills that would be transferable to other clerical kinds of activities, but at a lower level of skill."  (R 398)

The ALJ asked the VE to consider an individual of younger age with a high school education, some business college, Lynch's past relevant work, and "medically determinable health problems causing the same work related limitations described by Ms. Lynch."  (*Id.*)  The VE stated that if the individual were limited to part-time work, and could only stand for about ten minutes at a time, she would be unemployable. (R. 399)  However, he noted Lynch had testified she would be able to perform a job that required only those skills found during her FCE, so the ALJ added those parameters to the hypothetical, as follows:

> [W]hat if a person could occasionally lift and carry 20 pounds, frequently 10 pounds; could stand and/or walk at least two hours of an eight-hour day; sitting with normal breaks, about six hours of an eight-hour day; push, pull is unlimited; postural activities are occasional except no climbing of ladders, ropes, or scaffolds; not manipulative, or visual, or communicative limits; environmentally, they would avoid even moderate exposure to hazardous working conditions.

(R. 399-400)  The VE indicated the hypothetical individual should be able to perform Lynch's past work as a credit analyst, which is a sedentary position.  (R. 400)  The

hypothetical individual could perform the full range of sedentary work, and possibly some seated positions in the light work classification. (R. 400-01)

For the next hypothetical, the ALJ asked the VE to consider additional functional restrictions listed in the FCE. (*See* R. 285; *see also* R. 278-308) These restrictions included the following: ability to sit for up to 53 minutes at a time; ability to reach up for only two minutes at a time; stand and walk occasionally; perform overhead activities occasionally; no bending or squatting; no lifting from knee height; lifting from waist height of thirteen pounds occasionally and six pounds frequently; lifting from shoulder height and overhead of seven pounds occasionally and three pounds frequently; and no ability to use her hands for work requiring fine coordination. (R. 285, 401-02) The VE stated an individual with these restrictions would be able to perform sedentary work consistent with Lynch's prior job as a credit analyst. (R. 402) The VE indicated Lynch's limited ability to use her hands for fine manipulation might be "a factor" in her ability to work as a credit analyst, but he did not know how significant the limitation would be. (R. 405-06) The VE acknowledged that the FCE appeared to indicate (although not clearly) that Lynch's functional restrictions could prevent her from performing even sedentary work. (R. 406)

If Lynch's job as a credit analyst failed to qualify as substantial gainful activity, and therefore could not be considered as past relevant work, the VE indicated Lynch nevertheless should be able to perform other sedentary jobs such as charge account clerk or electronics worker. However, if Lynch's testimony were deemed credible, she would be unable to perform any work. (R. 407)

### 4.      *The ALJ's decision*

The ALJ found Lynch had not engaged in substantial gainful activity since her alleged onset date of September 1, 2004. (R. 15) He found Lynch to have severe impairments consisting of obesity and peripheral edema, but these impairments, singly or in combination, did not meet any of the impairments listed in the regulations. (R. 16, 18)

With regard to Lynch's hepatitis C, the ALJ noted the evidence of record suggests treatment for the disease was successful despite Lynch's noncompliance with follow-up and certain treatment recommendations, and the disease had not imposed limitations on Lynch's ability to work for a period of at least one year. (R. 16-17)

The ALJ acknowledged that Dr. Anderson had diagnosed Lynch with depression and a GAF suggesting severe symptoms. However, the ALJ observed that "Dr. Anderson's statements and conclusions appear to be based primarily on [Lynch's] subjective complaints rather than objective findings and are inconsistent with the results of the mental status examination." (R. 17) In addition, the ALJ noted Lynch repeatedly denied being depressed or feeling down, and in February 2006, she described her mood as "fine." (*Id.*) The ALJ concluded that Lynch's "mental health impairment would impose no more than a 'mild' degree of functional limitation in regard to restriction of activities of daily living, difficulties maintaining social functioning, and difficulties maintaining concentration, persistence, or pace." (*Id.*) He therefore concluded Lynch's depression was not a "severe" impairment. (*Id.*) The ALJ also found Lynch's back pain and carpal tunnel syndrome not to be severe impairments. (R. 18)

The ALJ found Lynch to have the following residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that claimant retains the residual functional capacity to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, push and/or pull weight consistent with her capacity for lifting and carrying, stand and/or walk (with normal breaks) for a total of at least two hours in an eight-hour workday, sit (with normal breaks) for a total of about six hours in an eight-hour workday, could never climb ladders, ropes, or scaffolds, could frequently climb ladders or stairs, balance, stoop, kneel, crouch, and crawl, and would need to avoid even moderate exposure to workplace hazards such as dangerous moving machinery and unprotected heights.

(*Id.*) In reaching this assessment, the ALJ found Lynch's allegations regarding the intensity, persistence, and limiting effects of her various symptoms not to be entirely

credible. He noted Lynch has a sporadic work history with minimal earnings, suggesting Lynch is not motivated to work full time. Lynch has not attempted any type of full-time work since her alleged onset date that would allow her to sit throughout most of the workday with only occasional standing, which the ALJ found compromises Lynch's claim that she is unable to perform any type of full-time work. (R. 20)

The ALJ also found Lynch's descriptions of her daily activities to be inconsistent with her claim that she is unable to work. He noted that in her applications for benefits, Lynch "reported that she watched television, prepared some meals, occasionally did the dishes, fed the inside pets (fish, bird, and hamster), crocheted, did the laundry, got the mail, spent time with others, shopped, paid bills, and performed some housework." (R. 20-21) In November 2005, Lynch reported that "she watched television, cared for her cats, did the laundry, washed the dishes, and prepared meals." (R. 21) In September 2006, she reportedly "had been working over 40 hours per week as a housekeeper and she continued to report in November of 2006 that she worked 40 hours per week cleaning houses." (*Id.*) In January 2007, she was working part-time at a gas station, and in February 2007, she reported that "she was independently employed as a housecleaner." (*Id.*) In March 2007, "although complaining of excruciating back pain, [Lynch] informed [a] nurse practitioner . . . that she was coming to town to 'clean house.'" (*Id.*) He further noted that at the time of Lynch's ALJ hearing, she was working eight to twelve hours per week as a cashier, a job that required her to stand throughout her two- to four-hour shift. (*Id.*)

The ALJ also found numerous inconsistencies between Lynch's subjective allegations of disability and the objective medical evidence. (*See* R. 22-32) Among other things, the ALJ noted none of Lynch's doctors had mentioned her obesity or health complications associated with her weight, nor had they imposed any limitations on Lynch's capacity to work on a sustained basis. The ALJ concluded, "The silence of her physicians in this regard speaks volumes as to the lack of credibility of [Lynch's] allegation of

disability." (R. 22) He noted Lynch had been treated conservatively throughout, which he found to be "inconsistent with the presence of chronic, severe, and significantly limiting impairments and resulting symptoms." (*Id.*) In addition, the ALJ found Lynch's failure to comply with recommended follow-up and treatment recommendations detracted from her overall credibility. (R. 23)

The ALJ observed that the FCE indicated Lynch could "work at the less than sedentary physical demand level for activity above the waist," with recommended limitations on her lifting, reaching, and other functional abilities. The ALJ noted that "although the functional capacity evaluation cited a number of limitations in regard to upper extremity limitations, . . . the evidence is absent information documenting the existence of a medically determinable impairment which could reasonably be expected to cause the manipulative limitations described [in the FCE report]." (R. 33)

The ALJ made a careful and thorough review of Lynch's medical history, noting multiple inconsistencies between Lynch's claims of disabling symptoms, her failure to comply with treatment recommendations and follow-up, the types of treatment she actually received, and her ongoing daily and work-related activities. (*See* R. 22-33) He concluded, "One could reasonably expect that an individual who experienced symptoms and limitations like those described by [Lynch] would follow any and all treatment recommendations from her medical care providers." (R. 33) In addition, although Lynch reported that financial constraints limited her ability to seek recommended treatment and required her to work part-time, the ALJ noted "the evidence reflects that, despite any financial constraints she experiences, [Lynch] chose to continue to smoke cigarettes and marijuana, despite the financial expenses associated with such." (*Id.*)

The ALJ found that the opinions of the medical consultants regarding Lynch's functional abilities were "entirely consistent with the nature and extent of [Lynch's] activities of daily living and the medical evidence as a whole." (R. 34) He further noted that "no treating or examining physician has offered an opinion regarding specific work-

related limitations which would preclude the performance of work within the above-described residual functional capacity." (*Id.*)

The ALJ found Lynch is unable to perform any of her past relevant work. (R. 34) However, he found that other jobs exist in significant numbers in the national economy that Lynch is able to perform including, for example, charge account clerk, and electronics worker. (R. 35-36) Because Lynch retains the functional capacity to work, the ALJ concluded she is not disabled. (R. 36)

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). First, the Commissioner will consider a claimant's work activity. If the

claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby, supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the

presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in

significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484

F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported

an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)      the claimant's daily activities;
> 2)      the duration, frequency and intensity of the pain;
> 3)      precipitating and aggravating factors;
> 4)      dosage, effectiveness and side effects of medication;
> 5)      functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## IV. DISCUSSION

Lynch argues the ALJ drew unreasonable inferences from the medical evidence regrading her functional abilities. She argues the record evidence is more consistent with the ALJ's first hypothetical question to the VE, which incorporated Lynch's subjective claim that she can only work part-time and can only stand for ten minutes at a time. Lynch argues that if her testimony is deemed credible with regard to her claim that she can only stand for ten minutes at a time, then according to the VE, she would be unable to perform any full-time work. (Doc. No. 10, p. 8)

Lynch asserts that the ALJ's inferences drawn from the medical evidence do not constitute substantial evidence on the record as a whole to support the ALJ's decision. (*Id.*, p. 10)

An ALJ is permitted to draw reasonable inferences from the record evidence. *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008). As discussed above, an ALJ must consider a number of factors in arriving at his credibility determination, but ultimately, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001) (citing *Benskin v. Bowen*, 830 F.3d 878, 882 (8th Cir. 1987)); *accord Bradley, supra*. If a proper review has been made, the court may not reweigh the evidence and substitute its opinion for that of the ALJ, even if the court might have reached a different conclusion. *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)).

The ALJ conducted an exhaustive review of Lynch's medical records, and went to great lengths to cite numerous specific examples to support his determination that Lynch's subjective claims are not fully credible. The court finds the ALJ's decision is supported by substantial evidence on the record as a whole, and Lynch has made no showing to the contrary.

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[2] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within fourteen (14) days of the service of this Report and Recommendation, that the Commissioner's decision be affirmed.

**IT IS SO ORDERED.**

**DATED** this 4h day of December, 2009.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[2]Objections must specify the parts of the report and recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.