**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

CHRISTINE A. LYNCH,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C08-4090-MWB

**MEMORANDUM OPINION AND**
**ORDER REGARDING**
**MAGISTRATE JUDGE'S REPORT**
**AND RECOMMENDATION**

_____

**TABLE OF CONTENTS**

*I.* *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
       *1.* *Introductory Facts and Lynch's Hearing Testimony* . . . . . . . . 4
       *2.* *Lynch's Medical History* . . . . . . . . . . . . . . . . . . . . . . . 7
       *3.* *Vocational Expert's testimony* . . . . . . . . . . . . . . . . . . . . 22
       *4.* *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*II.* *LEGAL STANDARDS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*III.* *PRELIMINARY MATTER: ADEQUACY OF LYNCH'S OBJECTION* . . . . 33

*IV.* *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
   *A. Lynch's Subjective Complaints* . . . . . . . . . . . . . . . . . . . . . . . . 36
   *B. Limitations From the Functional Capacity Evaluation* . . . . . . . . . . 38

*V.* *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## I. INTRODUCTION

### A. Procedural Background

On May 10, 2005, plaintiff Christine Lynch filed applications for Title II disability insurance[1] and Title XVI supplemental security income benefits[2], alleging a disability onset date of September 1, 2004. In her application, Lynch claimed that she was disabled due to hepatitis C, peripheral edema, and chronic pain. According to Lynch, she suffers from swelling in her feet after standing for any length of time, back pain, and abdominal pain. Lynch's applications were denied initially and on reconsideration. An Administrative Law Judge ("ALJ") held a hearing, as requested, on Lynch's claims on May 4, 2007. The ALJ issued a decision on August 28, 2007, which found that Lynch cannot return to any of her past relevant work but retains the functional capacity to perform other work—the ALJ found that Lynch was not disabled. On August 22, 2008, the Appeals Council denied Lynch's request to review the ALJ's decision, and this denial constituted a final decision of the Commissioner of Social Security ("Commissioner").

On October 20, 2008, Lynch filed a complaint in this court seeking review of the Commissioner's decision (docket no. 2)—the case was referred to Chief United States Magistrate Judge Paul A. Zoss for a report and recommendation, in accordance with Administrative Order #1447.

On March 6, 2009, Lynch filed her Brief and Argument of Plaintiff (docket no. 10). In her brief, Lynch argued that the ALJ should have believed her testimony that she could only work part-time and could only stand for ten minutes at a time. Based on those

---

[1]Title II of the Social Security Act provides insurance benefits to individuals who establish that they suffer from a physical or mental disability. *See* 42 U.S.C. § 423.

[2]Title XVI of the Social Security Act provides supplemental income to individuals who are disabled while also indigent. *See* 42 U.S.C. § 1382.

limitations, the vocational expert ("VE") found that Lynch would be unable to perform any past or other full-time work. Lynch also claimed that the ALJ improperly failed to consider her splints, carpal tunnel symptoms, and diminished sensation in finding that she was not disabled. Lynch argues that a Functional Capacity Evaluation ("FCE"), which recognized the alleged diminished sensation in her hands, determined that she could perform less than Sedentary Physical Demand Level for work above the waist, and determined that she had No Ability Demand Level for work below the waist.

On May 21, 2009, the Commissioner filed Defendant's Brief (docket no. 13). The Commissioner claimed that the ALJ's decision to deny benefits should be affirmed because there is substantial evidence in the record as a whole to support the following findings: (1) that Lynch did not have medically determinable impairments that could reasonably be expected to produce all of her alleged limitations—the Commissioner specifically claims that there is no objective evidence of carpel tunnel syndrome; (2) that Lynch's description of her limitations was not credible and not supported by (and was inconsistent with) the record as a whole, and (3) that Lynch retained the functional capacity to perform activities consistent with competitive work—the Commissioner claims that the ALJ was not required to rely entirely on the FCE's finding that Lynch was unable to perform some sedentary work.

On December 4, 2009, Judge Zoss issued a report and recommendation (docket no. 15), which noted the ALJ's exhaustive review of Lynch's medical records in supporting his assessment of Lynch's credibility and found that the ALJ's decision to deny Lynch benefits was supported by substantial evidence on the record as a whole.

On December 18, 2009, Lynch filed her Objections to Report and Recommendation (docket no. 16), which contains one objection to Judge Zoss's Report and Recommendation. Lynch objects to Judge Zoss's finding that the ALJ's decision to deny

benefits is supported by substantial evidence and identifies several pages that allegedly form the basis for her objection.

On December 22, 2009, the Commissioner filed Defendant's Response to Plaintiff's Objections to the United States Magistrate Judge's Report and Recommendation (docket no. 17). According to the Commissioner, Lynch's Objections to Report and Recommendation fails to comply with Federal Rule of Civil Procedure 72, because the one and only objection Lynch asserts fails to make reference to any specific portion of the Report and Recommendation nor specify the basis for the objection. Instead, the Commissioner claims that Lynch only generally objects to Judge Zoss's ultimate recommendation.

## B. Factual Background

In Judge Zoss's Report and Recommendation, he made the following findings of fact:

### 1. Introductory Facts and Lynch's Hearing Testimony

Lynch was thirty-five years old at the time of her hearing. She was 5'5" tall and weighed 268 pounds. She stated her weight was down ten pounds because she had begun some type of thyroid treatment. She was not on any type of weight management program, and according to her, no weight management program had ever been recommended for her. As of September 2004, she weighed about 230 pounds. (R. 374, 387-388) According to her, no doctor has ever told her that she is diabetic, or that she has any health complications caused by her body weight. (R. 390)

Lynch is divorced, and at the time of the hearing, she was living in a farmhouse in Spencer, Iowa, with her boyfriend and one of her three children, who was fourteen years old at that time. (*Id.*) Two other children, then ages ten

and thirteen, lived with their father. (R. 387) Lynch's boyfriend and son did most of the cooking and cleaning in the residence. (R. 393)

Lynch graduated from high school in 1990. In 1994, Lynch worked as a credit analyst at Sears Credit Central in Des Moines, a job she held for ten months. She took general business courses at the American Institute of Business for a year-and-a-half in 1994 and 1995. When she started school, she went from working full time to working part time. She worked for Sears again briefly in 1998, through a temporary agency. (R. 110, 375, 403-04) In 1995, she worked as an office assistant doing computer programming. (R. 110) Besides these two sedentary positions, Lynch worked from 1990 to 2003, at various other jobs including cashier at convenience stores, cooking at fast food restaurants and at a nursing home, housekeeper in a hotel, factory laborer, nurse's aide in a nursing home and an assisted living facility, and fast food waitress. (R. 110) At the time of the hearing, Lynch was working eight to twelve hours a week as a cashier at a gas station, a job she had held for five or six months. Her work hours were spread out over two to four days each week. She was paid $7.00 per hour. (R. 375-76)

Lynch quit working full time on September 1, 2004, because of "[p]ain and moodiness due to the pain." (R. 83) She had begun having problems with back pain, and her right leg "wasn't functioning correctly[.]" (R. 378) Her leg was "swelling and causing a lot of pain," and her feet would go numb and tingle. The problems worsened the longer she stood. (*Id.*) Her part-time job in 2007 required her to stand, and she still had times when her legs "flared up" and she had to stay home from work. (R. 391)

Lynch does not believe she could return to any of her past work, or that she could tolerate an increase in her hours as a cashier or clerk. (R. 387) However, she stated that if a job existed that met her functional capacities as found during her Functional Capacity Evaluation ("FCE"), she could work. (R. 396)

5

Initially, Lynch's primary treating medical professional was physician's assistant Denise Hemphill in Hartley, Iowa. P.A. Hemphill referred Lynch to Iowa City for an evaluation of her peripheral edema and back pain, but doctors in Iowa City were not able to determine a cause for the edema. Subsequently, Lynch began seeing Sherry Kolacia-Tighe, M.D. in Spencer, Iowa, who diagnosed Lynch with lymphedema. (R. 379-80) At the time of the ALJ hearing, Lynch was seeing Dr. Tighe twice a week for regular lab tests, monitoring, and follow-up of physical therapy prescribed by the doctor. (R. 381) Lynch stated the swelling in her right leg had improved since she started physical therapy. (*Id.*)

In the spring of 2007, Lynch's left leg also began swelling. She estimated she can stand on her feet for no more than ten to fifteen minutes at a time. She has constant leg pain, regardless of whether she is sitting or standing, and her legs swell even when she is wearing support socks. (R. 382-83) She has a formed wrap and bandage that she uses when the swelling gets "out of control," and she also uses the wrap every night to compress her leg. (R. 383)

Lynch stated she is unable to do any bending at all. If she drops something and is sitting down, she sometimes "can roll it up [her] leg." (R. 384) She also has problems with her hands tingling and going numb. She stated she was diagnosed with carpal tunnel syndrome in early 2007, and she has wrist braces that she wears at night. However, no doctor has suggested she have surgery or has advised her to limit her activities due to the condition. (R. 384-85) According to Lynch, an orthopedic doctor in Sioux Falls, South Dakota, diagnosed her with osteoarthritis in her hips and back, and carpal tunnel syndrome in her hands. After the consultation, she was fitted for splints by her treating doctor, but no other treatment has been suggested or attempted. (R. 385)

Lynch is on several medications, but she stated none of them causes side effects that would prevent her from working, although some of them make her mouth dry and make her a bit drowsy. (R. 386) She is on an antidepressant prescribed by

Dr. Tighe, and she went to a mental health center a couple of times after her mental health evaluation by a Social Security consultant. (R. 392) She has never been admitted to a hospital due to mental health problems, and she does not see a psychologist or psychiatrist. (R. 393)

Lynch was involved in an automobile accident in 2006, in which she reinjured her neck and spine. She was treated by a chiropractor. (R. 386-87)

## 2. *Lynch's Medical History*

On June 28, 2004, Lynch saw a physician's assistant with complaints of right foot and leg swelling and pain for several days with no precipitating injury. She stated the pain bothered her at night but was much worse during the day. Notes indicate Lynch's right ankle was quite swollen and tender to the touch, with pitting edema of both the foot and ankle. X-rays were normal. The doctor prescribed Vioxx, and directed Lynch to return in two weeks if the condition did not improve. (R. 224)

Lynch returned for follow-up on August 16, 2004. She stated her right foot and ankle were still quite painful, and she had been off work for several days due to the pain. The swelling and pain were somewhat improved but had never resolved, and she stated her ankle would change color from white to red. She also complained of periodic pain in the pelvic region, and some urinary hesitancy at times. (R. 222) An ultrasound and abdominal x-rays were largely unremarkable. (R. 220) She was referred to a doctor in the same clinic, and she saw the doctor the next day. She was scheduled for abdominal and pelvic CT scans, which also were unremarkable. (R. 222-23)

Lynch was seen on October 1, 2004, for follow-up of her peripheral edema and pain. She continued to complain of significant pain when she was standing on her leg, and she also had developed a burning sensation in the lateral thigh of her left leg. Notes indicate that multiple tests had come back normal and doctors could not determine the cause of Lynch's edema. Notes further indicate Lynch was frustrated because

the problem had persisted for four months; however, Lynch was "not good about follow-up" and had "missed at least 2 appointments since August." (R. 220) Lynch was not working, and the physician's assistant felt Lynch had come in primarily "to get a note saying that she can't work." (*Id.*) She was referred to the University of Iowa for a full workup. (*Id.*)

On December 7, 2004, Lynch was seen at the University of Iowa Hospitals and Clinics for evaluation of her complaints of abdominal pain and heartburn. (R. 203-06) Previous gynecological testing and procedures had failed to reveal the source of her pain. (*See* R. 190-91, 207-09) She described the pain as "stabbing, crampy, and occasionally dull discomfort." (R. 204) She denied that the pain was relieved by moving her bowels, and she indicated the pain sometimes was worse with eating and with movement. She underwent a colonoscopy and upper endoscopy on December 14, 2004, both of which were normal. (R. 199) However, liver function tests were elevated, indicating the presence of the hepatitis C antibody. She was scheduled to be seen in the Liver Clinic for further evaluation. (R. 202)

On January 19, 2005, Lynch was seen in the Liver Clinic for evaluation of her elevated liver function tests. Notes indicate Lynch had a history of IV drug use, with her last use of drugs two days prior to the exam. Lynch complained of chronic pelvic pain that worsened when eating and with movement, and improved with sitting still. She also complained of a history of swelling in her left foot for several months. She reported smoking one pack of cigarettes daily for sixteen years, and drinking occasionally at social functions. Doctors recommended Lynch abstain from all alcohol and drug use, noting she needed to be abstinent for six months before she could be treated for hepatitis C. (R. 192-93)

Lynch saw a doctor on March 22, 2005, with complaints of right lower extremity pain and right foot swelling. She stated she had noticed the swelling upon removing her shoes one day after work. Pain in her leg

gradually increased over time, and she stated she had been unable to work for four months due to the pain. She experienced pain primarily from her ankle to her knee, occasionally traveling up to her groin area and into her low back. The pain was worse when she stood or walked, and when she sat for any length of time. She also complained of occasional pain, numbness, and tingling in her left lateral thigh. She reportedly had tried Ted hose and various medications with little success. X-rays and lab work were scheduled, and she received a prescription for a nicotine patch to assist her with smoking cessation, and medications for gastritis and allergies. (R. 186-87)

Lynch was seen for follow-up of her right lower extremity pain and swelling on April 12, 2005. (R. 180-83) X-rays of her lumbar spine were normal, and an MRI was recommended to evaluate her for spinal stenosis. She was continued on amitriptyline for "possible neuropathic pain secondary to hepatitis C." (R. 182)

Lynch underwent a needle core biopsy of her liver on April 13, 2005, that resulted in a diagnosis of chronic hepatitis C with mild portal and focal central fibrosis. (R. 168) On April 15, 2005, she underwent a biopsy of her duodenum to rule out celiac disease. (R. 169) She was seen on April 28, 2005, for follow-up of her hepatitis C. She complained of "diffuse myalgias and joint complaints with pain in her abdomen, leg, back, neck along with headaches." (R. 177) Notes indicate Lynch had "hepatitis C genotype 1A with a high viral load," and "mild fibrosis" of her liver. (*Id.*) Lynch indicated she was using marijuana daily for pain. She had tried a nicotine patch in the past but was not using it currently and was still smoking tobacco. She apparently had abused methamphetamine in the past but she stated her last use was a month earlier. Doctors wanted Lynch to remain abstinent from all recreational drugs for at least six months before commencing treatment for hepatitis C. They also wanted Lynch's pain issues to be addressed prior to beginning

Interferon treatment because Interferon could exacerbate her joint pain and myalgias. (R. 177-78)

Lynch was seen on May 17, 2005, for follow-up of her leg pain, back pain, allergies, and abdominal pain. She was sleeping better after starting amitriptyline, but she had experienced no relief from her pain. She complained of "achy pain on the left leg and more sharp pain on the right leg with both legs having decreased sensation from the midcalf to her feet." (R. 174) She also complained of back pain on waking and with any type of activity. Her amitriptyline dosage was increased for her diagnosis of peripheral neuropathy. She was given a prescription for the muscle relaxer Kelaxin, the only muscle relaxer that had worked for her in the past, but notes indicate the drug was not covered by state assistance and Lynch would have to fill it out-of-pocket if she so desired. She also was given a prescription for Zyrtec for her allergies, and she was encouraged "to eat less fatty foods and more whole fruits and vegetables and whole grains." (R. 174-75)

Lynch was seen on June 21, 2005, for follow-up of her complaints of leg pain, back pain, and abdominal pain. She stated her back pain was mildly better since she had started taking Flexeril, but she had no increase in her ability to function. She complained of ongoing leg and foot pain, worse on the right, and she stated she was unable to move her toes as well as she could previously. She also had decreased sensation from mid-calf to her feet on both legs, and a numb patch on her left thigh. Lynch stated the numbness and pain in her legs caused her to "walk differently," and she indicated she could not walk very fast or she would fall. The doctor opined Lynch likely had idiopathic peripheral neuropathy, and he planned to order an MRI to rule out disc protrusion and nerve root impingement. (R. 172-73)

Lynch also stated her abdominal pain was somewhat improved, but she continued to feel bloated. Notes indicate she had failed to implement doctors' suggestion that she eat less meat and fat. She again was advised to increase the fiber in her diet and decrease fat and protein. (*Id.*)

X-rays and an MRI were performed on June 29, 2005, of Lynch's lumbar spine in connection with her ongoing complaints of bilateral leg pain. No abnormalities of Lynch's lumbar spine were revealed by the studies. (R. 167, 171)

On July 13, 2005, J.D. Wilson, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. (R. 132-38) Dr. Wilson noted Lynch had "chronic moderately active Hepatitis C with mild fibrosis," and a history of substance abuse currently in early remission. (R. 133) He noted Lynch had abdominal pain, and left leg pain with peripheral edema that had to be controlled before Interferon therapy could be instituted. He also noted Lynch had upper quadrant pain that likely was "a dietary issue," and he indicated Lynch's doctor had advised her to consume "more fiber and less meat," a recommendation Lynch had not yet followed. (R. 133-34) Dr. Wilson opined that Lynch's impairments were severe but not disabling, and he opined she would be able to lift/carry twenty pounds occasionally and ten pounds frequently; stand and/or walk, and sit, for about six hours each in an eight-hour workday with normal breaks; and perform all postural activities occasionally with the exception of climbing ladders, ropes, or scaffolds, which she should avoid due to her leg pain and loss of sensation in the lower part of her legs. (R. 132-38)

On September 29, 2005, Lynch was seen at the University of Iowa for follow-up of her lower extremity and back pain. (R. 163-65) She reported worsened pain in her right leg with increased difficulty of movement. She reported that amitriptyline was not helping her pain much, but she continued to take 100 mg at bedtime. Notes indicate the doctor wanted to prescribe gabapentin but it was not covered by Iowa Care, and Lynch could not afford to purchase the medication independently. (R. 164) She was continued on amitriptyline. (*Id.*)

Another paper review was performed on October 29, 2005, by Jan Hunter, D.O., in connection with Lynch's request for reconsideration. (R. 139-47) Dr. Hunter found

that since the July 2005 assessment, Lynch's ability to stand and/or walk had been compromised due to her ongoing lower extremity pain. Accordingly, Dr. Hunter reduced the amount of time Lynch could stand/walk to two hours in an eight-hour workday. Otherwise, the assessment was identical to the one done by Dr. Wilson.

Lynch returned to the Liver Clinic in Iowa City for follow-up on November 2, 2005. She reportedly had been off alcohol for two years, and off methamphetamine for six to seven months. She still used marijuana about once a week. She continued to have pain in her ankles, fingers, and left thigh, and some numbness in her feet. In addition, she was experiencing some nausea since she had to stop taking Prevacid due to lack of prescription coverage. The treatment protocol for hepatitis C was reviewed with Lynch, and she was tentatively scheduled to begin treatment for hepatitis C on November 21, 2005. She was given prescriptions for Pegasys and ribavirin. She was instructed to check with Iowa Care to see if the medications were covered, and if they were not, to contact the clinic. (R. 349-50) Lynch called the clinic on November 4, 2005, to report that the hepatitis C treatment had been approved through Iowa Care. (R. 348)

On November 17, 2005, Lynch underwent a psychiatric evaluation by Paul Dean Anderson, D.O. at the request of the state agency. Notes indicate Lynch had never seen a psychiatrist before, and she was "the sole source of information for this evaluation." (R. 210) Dr. Anderson noted Lynch did not appear to care for herself well, and she appeared older than her age of 33. She was tearful throughout the interview, and complained of fatigue. The doctor observed that Lynch tried "to minimize her symptoms, as she wants to get the interferon treatment and knows that depression might keep her from that for a period of time." (R. 212) Lynch described her typical day as follows:

> An average day consists of the patient getting up between 4 a.m. and 6 a.m. She sits on the couch and contemplates going back to sleep, generally, then she

gets a soda and a cigarette, checks the weather on the weather channel, lets her cats out, feeds them, may do some laundry, watches TV, does dishes during commercials. Her boyfriend pays all the bills and helps her with housework. She fixes meals. She is in bed around 10 p.m., actually not in bed, yet she falls asleep before 10, generally on the couch, and gets up by midnight to go to bed.

(R. 211)   Dr. Anderson diagnosed Lynch with Major depression, single episode; PTSD, chronic and delayed; and Borderline Personality traits. He assessed her current GAF at 35.[3]

On November 21, 2005, Lynch started treatment for hepatitis C using Pegasys and ribavirin. (R. 343)

On December 6, 2005, Beverly Westra, Ph.D. reviewed the record and completed a Psychiatric Review Technique form. (R. 148-62) She found Lynch to have no severe mental problems that would affect her ability to work. (*Id.*)

Lynch was seen for follow-up of her hepatitis C treatment on January 11, 2006. She was experiencing some ongoing side effects from the treatment including intermittent nausea and stomach pain, occasional vomiting, intermittent fevers, mood fluctuations, rash and hives, disrupted sleep, and some site reactions from the Pegasys injection. Her appetite was fair and her weight was remaining stable. She was meeting with a counselor weekly and with a psychiatrist monthly. Testing indicated Lynch's liver enzymes had improved somewhat. She had developed anemia, and she was instructed to contact the clinic if she became symptomatic from the anemia. She was given prescriptions for the rash and

---

[3] A GAF of 35 indicates "some impairment in reality testing or communication or major impairment in several areas such as work, family relations, and judgment." *Bartrom v. Apfel*, 234 F.3d 1272 (Table), 2000 WL 1412777, at *1 n.3 (7th Cir. Sept. 20, 2000).

itching, and she was directed to return for follow-up in one month. (R. 343-44)

Lynch was seen the same day for follow-up of pain management. Lynch complained of chronic pain in her lower and mid back, and "a twisting sensation in the lower extremities on the right in particular, a tingling sensation[.]" (R .341) She stated her psychiatrist had started her on Cymbalta a few days before this visit. On examination, Lynch exhibited "pretty significant palpable tenderness throughout the whole back region," and she was "very reluctant to flex or extend or lateral movements due to discomfort." (*Id.*) She was able to heel and toe walk, and her lower extremity sensation, muscle strength, and patellar reflexes were normal. The doctor opined that Lynch's tightness in her back was due to lack of movement, and she was encouraged to do stretching. She was given a prescription for muscle spasm and discomfort. She also was encouraged to continue using the Cymbalta, which notes indicate "was an excellent choice in terms of treatment of low mood as well as chronic pain." (*Id.*)

Lynch returned for follow-up of her hepatitis C on February 28, 2006. Notes indicate Lynch traveled to her appointments "using the hospital car," which was covered by Iowa Care, and a problem with the hospital car scheduling had prevented her from returning for a scheduled appointment a few weeks earlier. As a result, she had run out of her hepatitis C medications about three weeks before this visit. Lynch complained of ongoing problems with dry skin, itching and pruritus on her abdomen and legs, and sleep disruption. She denied changes in her appetite and indicated her mood had been "fine," with no depression or "feeling down." (R. 337) She continued to smoke but was down to less than one pack per day, and she continued to use marijuana once or twice per week. On examination, Lynch exhibited mild diffuse tenderness of her abdomen, with no other remarkable findings. Her hepatitis C medications were refilled, and she was scheduled for monthly follow-up visits to evaluate her response to the therapy. (R. 338)

On March 1, 2006, Lynch was seen in the Pain Clinic in Iowa City for evaluation and treatment of her widespread pain complaints. Lynch stated she had had pain since a car accident in 1990. She described her pain as follows: "back pain as a constant pressure located in the lower back and shoulder. Leg pain is numbness and shooting. Left leg burning and tingling in the upper thigh." (R. 334) She rated her pain at six on a ten-point scale. She had tried a number of medications without any lasting success, and she currently was taking a muscle relaxer and Doxepin. Doctors added Salsalate to her medication regimen. (*Id.*)

Lynch was seen for follow-up in the Pain Clinic on July 25, 2006, following a motor vehicle collision that occurred on July 21, 2006. She initially had thought she was not injured but since that time had been experiencing "increasing pain in her neck, radiating down her back and into her shoulders and arms bilaterally." (R. 331) She also had an abrasion over her left neck from her seatbelt. She had stopped taking Doxepin when she ran out of the medication. On examination, Lynch exhibited "limited range of motion in the neck in all directions due to pain," and "diffuse tenderness to palpation over her musculature of the neck." (*Id.*) Her gait was noted to be "slightly antalgic to the left." (R. 332) She was diagnosed with a cervical neck strain and possible contusion. A CT scan of her neck ruled out any fracture. (*Id.*) She received a refill of Salsalate and the muscle relaxer. (*Id.*)

Lynch returned for follow-up of her chronic pain on August 30, 2006. Lynch indicated she had "missed her last few appointments because . . . she was just fed up with having to come to Iowa City so much." (R. 328) Lynch stated her pain had worsened and the only medication that was helpful was Darvocet. She indicated the Salsalate had no effect on her pain. Her prescriptions for amitriptyline, Doxepin, and the muscle relaxer were renewed, and Piroxicam, an NSAID, was added to her regimen. (*Id.*) X-rays of her lumbar spine and right foot were negative for any abnormalities, although some

soft tissue swelling was present in her foot over the dorsum. (R. 329)  Her liver function tests were normal.  (R. 326)

Lynch was seen for follow-up in the Liver Clinic on September 26, 2006.  Notes indicate Lynch's hepatitis C treatment was discontinued because she had failed to return for scheduled follow-up visits and had been noncompliant for several weeks.  (R. 322)  In any event, her liver enzymes were normal in August 2006, indicating her treatment had been successful.  Lynch was not having any problems with abdominal pain, nausea, vomiting, rashes, or bleeding/bruising easily.  She had some edema in her right foot.  Lab tests were ordered to see if she continued to have any detectable virus, and Lynch was instructed to call the clinic in two weeks to obtain her test results and discuss whether further treatment was indicated.  (R. 323)

Lynch also was evaluated in the Pain Clinic on September 26, 2006.  She continued to complain of pain in her back, right leg, and foot.  She reported some relief from the Piroxicam, and that prescription was renewed along with the muscle relaxer.  Doctors also recommended she begin water therapy, and they gave her "a note to bring to some local pools to see if they can give her a discount there."  (R. 320)

Lynch was seen in the Orthopaedics Clinic on November 7, 2006, for evaluation of her low back pain.  She indicated she had not followed through with the pool exercises because she had no access to a pool.  She reported pain throughout her low back, buttocks, and into both thighs, and weakness and swelling in her right leg.  She indicated her symptoms were "constant irrespective of sitting, standing, walking, or lying down."  (R. 318)  Lynch stated she was working "40 hours a week cleaning houses."  (*Id.*)  Lynch "was instructed in lumbar stabilization exercises involving both flexion and extension strengthening and motor control."  (R. 319)  She was instructed to do the exercises for one to two months, progressing gradually as tolerated.  (*Id.*)  She also was seen in the Pain Clinic, where her medications were reviewed and gabapentin was added to her regimen.  She was

encouraged to do the aqua therapy, and if she had no access to a pool, to do stretching exercises in a hot shower or tub to increase her ranges of motion. (R. 315-16)

Lynch underwent a Functional Capacity Evaluation ("FCE") on April 17, 2007. (R. 287-308) The evaluator found Lynch could never squat or bend. She could lift up to thirteen pounds occasionally, six pounds frequently, and two pounds constantly at waist level, which would apply to sedentary positions. She showed less-than-sedentary ability to lift at shoulder level or overhead, and no ability to lift at the knee level. She could reach up and out frequently, defined as 34-66% of the day; and bend, walk, and stand for up to one-third of the day. She had no ability to use her hands for work requiring fine coordination. (*See* R. 285, 297). Lynch was deemed to have given maximum effort on all tests and the results of her testing were deemed reliable. (R. 305)

Regarding Lynch's specific abilities and limitations, the evaluator found the following:

1.     Overall the questionnaires appear consistent with ability with exception of sit ability, which appears underestimated and stand ability appears overestimated. Corresponding to work ability she would be able to sit for up to 53 minutes and reach out or reach up occasionally to frequently. Her stand ability is significantly compromised and would also affect her ability to perform any job that requires standing.

2.     When considering her hand sensation, she displays a diminished protective sensation on the left dorsal and volar surface. Her right hand displays a diminished protective sensation on the volar surface and loss of protective sensation to diminished protective sensation dorsal surface. The degree of diminished sensation would cause a significant impairment when performing fine coordination tasks when looking at the overall picture of sitting, reach up[,] reach out and sensation.

3.      Work ability is further restricted when considering she has no ability to bend or squat. These positions are used when lifting objects from the floor or knee level. She therefore is unable to perform any lifting from the floor or knee level.

4.      Ability to perform any overhead work is restricted to 2 minutes. She was not able to meet the testing time of 5 minutes. Again, when looking at her hand sensation combined with her limited overhead activity level, she is impaired with this ability.

5.      Results of fine coordination testing also verifies an inability to use her hands in a job that requires assembly or production work. She falls well below the normative population. Noted there was a ready response noted and an increase in attempted speed when comparing practice verses actual testing indicating good effort.

6.      Results of grip testing indicates she has a normal strength when compared to the normative population. Gripping of an object typically also involves some form of manipulation of the object also. The manipulation of any object would be affected secondary to her sensation.

7.      Pinch ability falls in the same category, i.e. she has a normal pinch but would be restricted with manipulation of an object secondary to decreased sensation.

8.      Individual could benefit from use of adaptive equipment to perform basic living skills. She could use a reach to pick up objects from the floor, use a bath sponge to bathe herself, and a dressing stick to assist with dressing/undressing. This is due to her inability to bend or squat and would increase safety in and around the home.

(R. 285-86) In summary, the evaluator indicated Lynch's testing indicated "a current work capacity characterized by the

18

less than Sedentary Physical Demand Level for work above the waist and the No Ability Physical Demand Level for work below the waist." (R. 285)

On January 15, 2007, Lynch saw Sherry Tighe, M.D. at Milford Family Care for establishment with this local physician after qualifying for Title XIX assistance. She reported her current medications as Cyclobenzaprine (a muscle relaxant), 40 mg two to three times daily as needed, with her only side effect being dry mouth; Loratadine for allergies; Neurontin 300 mg three times daily "for neuralgia related to her back pain"; amitriptyline, 75 mg at night, for insomnia; and Piroxicam, an NSAID, 20 mg as needed for pain. (R. 276) Dr. Tighe reduced Lynch's muscle relaxant dosage to 20 mg up to four times daily, because the doctor "was concerned about oversedation and side effects." (R. 277) She planned to obtain Lynch's records from Iowa City before ordering further testing or prescribing other medications. She noted Lynch "describes that she has significant pain an[d] no one quite understands how severe in pain she is, although her examination shows fairly well preserved range of motion." (*Id.*)

Lynch saw a physician's assistant in the Milford clinic on February 16, 2007, complaining of right foot pain, and sinus tenderness and discomfort. Notes indicate Lynch was "independently employed as a housecleaner." (R. 274) Lynch reported that despite Dr. Tighe's recommendation that she cut back on her muscle relaxer, she had continued taking 20 mg up to four times daily, as well as Loratadine, gabapentin, amitriptyline, and Piroxicam. The P.A. indicated Lynch would "anticipate pain and jerk[]" before even being touched, and she jerked as if in pain when touched with a stethoscope on her back. "She also seem[ed] to have difficulty getting up on the examination table, however, when she [came] down and walk[ed] to the chair that same pain [did] not seem apparent." (*Id.*) Lynch reported pain all over her back on palpation. The P.A. advised Lynch to use proper lifting techniques and to stretch before performing any activities. Lynch was referred

to a physical therapist for evaluation. The P.A. also "encouraged her to monitor her blood pressure [and] get off cigarettes[.]" (R. 275) The P.A. then noted the following:

> I offered to refer this patient back to the University of Iowa and she refused that. Worth noting I told her that I would not be responsible for her negative outcomes and that the Flexeril she must cut back. I advised her that at such large doses she could easily be causing difficulties with her liver. This seems to be a somewhat difficult patient in that she seems fairly set on what she wants and I am uncertain if she is actually seeking the Flexeril for herself or possibly someone else. Worth noting, I did not give her any pain medications today and did not give her any narcotics.

(*Id.*)

In a later note on February 19, 2007, after talking with the University of Iowa, the P.A. indicated Lynch was only supposed to take 10 to 20 mg of Flexeril twice daily, instead of the 40 mg two to three times daily that she had been using. The Pain Clinic also reported that they had "suggested lumbar exercises and aerobic walking, aqua therapy, hot showers, stretching, weaning off the Cymbalta and Neurontin," and told Lynch to come back to Iowa City for follow-up in January of 2007, which she had not done. The P.A. noted, "We will want to make sure we coordinate with the University of Iowa and do not contradict the treatment plan as recommended by the University of Iowa and reinforce that." (R. 273)

Lynch saw Dr. Tighe for follow-up on February 23, 2007. Lynch reported that she had noticed only a modest difference since the P.A. had discontinued her Flexeril. She indicated she might have overstretched during physical therapy and done more damage. Examination of Lynch's back revealed tenderness, especially in her lumbar back, but fairly good range of motion. She also had tenderness in her shoulders, right elbow, hips, and ankle. She was advised to continue with the physical therapy, and the doctor planned to

refer Lynch to a rheumatologist to rule out any myofascial type of pain syndrome. (R. 267)

Lynch saw a P.A. on March 8, 2007, with complaints of recurring sinus infection, and possible sleep apnea. Lynch's son "states that she stops breathing and gurgles" during the night, and Lynch experienced a lot of daytime fatigue. (R. 266) She had gained some weight. The P.A. ordered thyroid tests and indicated a future referral for a sleep study might be indicated. (*Id.*)

Lynch returned to see Dr. Tighe on March 19, 2007. Notes indicate Lynch had come to the clinic on March 16, 2007, exhibiting "peripheral 1-2+ pitting edema on the right . . . and was placed on Lasix." (R. 263) Lynch had been referred to a rheumatologist who felt Lynch's back pain was due to "degenerative changes and carpal tunnel," and carpal tunnel splints were recommended. (*Id.*) Lynch was taking Naproxen, Piroxicam, and Cymbalta for pain, and her medications were suspected as a possible cause of her edema. Lynch requested Darvocet or Hydrocodone, but Dr. Tighe was reluctant to prescribe narcotics which she felt could be counterproductive. She prescribed Ultram instead and advised Lynch to start aqua therapy. She also started Lynch on the carpal tunnel splints. (*Id.*)

Lynch called the clinic on March 30, 2007, and spoke to a P.A. Lynch stated she was "in excruciating back pain," and she wanted "a steroid shot into her lower back." (R. 261) She was still attending physical therapy sessions three times weekly, and was cleaning a house. She had been to two sessions of water therapy and felt she needed more pain control. She currently was taking Tramadol, two pills up to three times daily; Tylenol; and Lasix. Lynch stated she had been off work all week from her job at a gas station. The P.A. advised Lynch to go to the emergency room if she was in that much pain, and cautioned that she should not be doing a house cleaning job if her back was in that much pain. The P.A. recommended that Lynch "rest, put her legs up, elevate the knees," take her Lasix faithfully, and return for follow-up

with Dr. Tighe.  At that point, Lynch hung up on the P.A. (*Id.*)

### 3. *Vocational Expert's testimony*

VE William B. Tucker stated Lynch likely would have gained transferable clerical skills from her work as a credit analyst, which is a skilled occupation.  He stated "there would be clerical kinds of skills that would be transferable to other clerical kinds of activities, but at a lower level of skill."  (R 398)

The ALJ asked the VE to consider an individual of younger age with a high school education, some business college, Lynch's past relevant work, and "medically determinable health problems causing the same work related limitations described by Ms. Lynch." (*Id.*)  The VE stated that if the individual were limited to part-time work, and could only stand for about ten minutes at a time, she would be unemployable.  (R. 399)  However, he noted Lynch had testified she would be able to perform a job that required only those skills found during her FCE, so the ALJ added those parameters to the hypothetical, as follows:

> [W]hat if a person could occasionally lift and carry 20 pounds, frequently 10 pounds; could stand and/or walk at least two hours of an eight-hour day; sitting with normal breaks, about six hours of an eight-hour day; push, pull is unlimited; postural activities are occasional except no climbing of ladders, ropes, or scaffolds; not manipulative, or visual, or communicative limits; environmentally, they would avoid even moderate exposure to hazardous working conditions.

(R. 399-400)  The VE indicated the hypothetical individual should be able to perform Lynch's past work as a credit analyst, which is a sedentary position.  (R. 400)  The hypothetical individual could perform the full range of sedentary work, and possibly some seated positions in the light work classification.  (R. 400-01)

For the next hypothetical, the ALJ asked the VE to consider additional functional restrictions listed in the FCE. (*See* R. 285; *see also* R. 278-308) These restrictions included the following: ability to sit for up to 53 minutes at a time; ability to reach up for only two minutes at a time; stand and walk occasionally; perform overhead activities occasionally; no bending or squatting; no lifting from knee height; lifting from waist height of thirteen pounds occasionally and six pounds frequently; lifting from shoulder height and overhead of seven pounds occasionally and three pounds frequently; and no ability to use her hands for work requiring fine coordination. (R. 285, 401-02) The VE stated an individual with these restrictions would be able to perform sedentary work consistent with Lynch's prior job as a credit analyst. (R. 402) The VE indicated Lynch's limited ability to use her hands for fine manipulation might be "a factor" in her ability to work as a credit analyst, but he did not know how significant the limitation would be. (R. 405-06) The VE acknowledged that the FCE appeared to indicate (although not clearly) that Lynch's functional restrictions could prevent her from performing even sedentary work. (R. 406)

If Lynch's job as a credit analyst failed to qualify as substantial gainful activity, and therefore could not be considered as past relevant work, the VE indicated Lynch nevertheless should be able to perform other sedentary jobs such as charge account clerk or electronics worker. However, if Lynch's testimony were deemed credible, she would be unable to perform any work. (R. 407)

### 4.    The ALJ's decision

The ALJ found Lynch had not engaged in substantial gainful activity since her alleged onset date of September 1, 2004. (R. 15) He found Lynch to have severe impairments consisting of obesity and peripheral edema, but these impairments, singly or in combination, did not meet any of the impairments listed in the regulations. (R. 16, 18) With regard to Lynch's hepatitis C, the ALJ noted the evidence of record suggests treatment for the disease was successful despite

Lynch's noncompliance with follow-up and certain treatment recommendations, and the disease had not imposed limitations on Lynch's ability to work for a period of at least one year. (R. 16-17)

The ALJ acknowledged that Dr. Anderson had diagnosed Lynch with depression and a GAF suggesting severe symptoms. However, the ALJ observed that "Dr. Anderson's statements and conclusions appear to be based primarily on [Lynch's] subjective complaints rather than objective findings and are inconsistent with the results of the mental status examination." (R. 17) In addition, the ALJ noted Lynch repeatedly denied being depressed or feeling down, and in February 2006, she described her mood as "fine." (*Id.*) The ALJ concluded that Lynch's "mental health impairment would impose no more than a 'mild' degree of functional limitation in regard to restriction of activities of daily living, difficulties maintaining social functioning, and difficulties maintaining concentration, persistence, or pace." (*Id.*) He therefore concluded Lynch's depression was not a "severe" impairment. (*Id.*) The ALJ also found Lynch's back pain and carpal tunnel syndrome not to be severe impairments. (R. 18)

The ALJ found Lynch to have the following residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that claimant retains the residual functional capacity to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, push and/or pull weight consistent with her capacity for lifting and carrying, stand and/or walk (with normal breaks) for a total of at least two hours in an eight-hour workday, sit (with normal breaks) for a total of about six hours in an eight-hour workday, could never climb ladders, ropes, or scaffolds, could frequently climb ladders or stairs, balance, stoop, kneel, crouch, and crawl, and would need to avoid even moderate exposure to workplace hazards such as dangerous moving machinery and unprotected heights.

(*Id.*)  In reaching this assessment, the ALJ found Lynch's allegations regarding the intensity, persistence, and limiting effects of her various symptoms not to be entirely credible. He noted Lynch has a sporadic work history with minimal earnings, suggesting Lynch is not motivated to work full time. Lynch has not attempted any type of full-time work since her alleged onset date that would allow her to sit throughout most of the workday with only occasional standing, which the ALJ found compromises Lynch's claim that she is unable to perform any type of full-time work.  (R. 20)

The ALJ also found Lynch's descriptions of her daily activities to be inconsistent with her claim that she is unable to work.  He noted that in her applications for benefits, Lynch "reported that she watched television, prepared some meals, occasionally did the dishes, fed the inside pets (fish, bird, and hamster), crocheted, did the laundry, got the mail, spent time with others, shopped, paid bills, and performed some housework."  (R. 20-21)  In November 2005, Lynch reported that "she watched television, cared for her cats, did the laundry, washed the dishes, and prepared meals."  (R. 21)  In September 2006, she reportedly "had been working over 40 hours per week as a housekeeper and she continued to report in November of 2006 that she worked 40 hours per week cleaning houses."  (*Id.*)  In January 2007, she was working part-time at a gas station, and in February 2007, she reported that "she was independently employed as a housecleaner." (*Id.*)  In March 2007, "although complaining of excruciating back pain, [Lynch] informed [a] nurse practitioner . . . that she was coming to town to 'clean house.'"  (*Id.*)  He further noted that at the time of Lynch's ALJ hearing, she was working eight to twelve hours per week as a cashier, a job that required her to stand throughout her two- to four-hour shift.  (*Id.*)

The ALJ also found numerous inconsistencies between Lynch's subjective allegations of disability and the objective medical evidence.  (*See* R. 22-32)  Among other things, the ALJ noted none of Lynch's doctors had mentioned her obesity

or health complications associated with her weight, nor had they imposed any limitations on Lynch's capacity to work on a sustained basis. The ALJ concluded, "The silence of her physicians in this regard speaks volumes as to the lack of credibility of [Lynch's] allegation of disability." (R. 22) He noted Lynch had been treated conservatively throughout, which he found to be "inconsistent with the presence of chronic, severe, and significantly limiting impairments and resulting symptoms." (*Id.*) In addition, the ALJ found Lynch's failure to comply with recommended follow-up and treatment recommendations detracted from her overall credibility. (R. 23)

The ALJ observed that the FCE indicated Lynch could "work at the less than sedentary physical demand level for activity above the waist," with recommended limitations on her lifting, reaching, and other functional abilities. The ALJ noted that "although the functional capacity evaluation cited a number of limitations in regard to upper extremity limitations, . . . the evidence is absent information documenting the existence of a medically determinable impairment which could reasonably be expected to cause the manipulative limitations described [in the FCE report]." (R. 33)

The ALJ made a careful and thorough review of Lynch's medical history, noting multiple inconsistencies between Lynch's claims of disabling symptoms, her failure to comply with treatment recommendations and follow-up, the types of treatment she actually received, and her ongoing daily and work-related activities. (*See* R. 22-33) He concluded, "One could reasonably expect that an individual who experienced symptoms and limitations like those described by [Lynch] would follow any and all treatment recommendations from her medical care providers." (R. 33) In addition, although Lynch reported that financial constraints limited her ability to seek recommended treatment and required her to work part-time, the ALJ noted "the evidence reflects that, despite any financial constraints she experiences, [Lynch]

chose to continue to smoke cigarettes and marijuana, despite the financial expenses associated with such." (*Id.*)

The ALJ found that the opinions of the medical consultants regarding Lynch's functional abilities were "entirely consistent with the nature and extent of [Lynch's] activities of daily living and the medical evidence as a whole." (R. 34) He further noted that "no treating or examining physician has offered an opinion regarding specific work-related limitations which would preclude the performance of work within the above-described residual functional capacity." (*Id.*)

The ALJ found Lynch is unable to perform any of her past relevant work. (R. 34) However, he found that other jobs exist in significant numbers in the national economy that Lynch is able to perform including, for example, charge account clerk, and electronics worker. (R. 35-36) Because Lynch retains the functional capacity to work, the ALJ concluded she is not disabled. (R. 36)

Docket no. 15.

Upon review of the record, and absent any objections to Judge Zoss's factual findings, the court adopts all of Judge Zoss's factual findings.

## II. LEGAL STANDARDS

The court reviews the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (2006); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. Iᴀ. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court *may* review *de novo* any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

*De novo* review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting *de novo* review is "distinct from any form of deferential review"). The *de novo* review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been

made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while *de novo* review generally entails review of an entire matter, in the context of § 636 a district court's *required de novo* review is limited to "*de novo* determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any *issue* need only ask." (emphasis added)). Consequently, the Eighth Circuit Court of Appeals has indicated *de novo* review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger *de novo* review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has been willing to "liberally construe[]" otherwise general *pro se* objections to require a *de novo* review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise, *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require *de novo* review, it is clear to this court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, this court will strive to provide *de novo* review of all issues

29

that might be addressed by any objection, whether general or specific, but will not feel compelled to give *de novo* review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting *de novo* review with "clearly erroneous standard" of review, and recognizing *de novo* review was required because objections were filed). The court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a

definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than *de novo* is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the court believes one further caveat is necessary: a district court always remains free to render its own decision under *de novo* review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.[4]

---

[4] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United*
(continued...)

In this case, Lynch has broadly objected to Judge Zoss's finding that the ALJ's decision to deny benefits is supported by substantial evidence. Although the court will review Judge Zoss's finding, *de novo*, the court reviews the Commissioner's decision to determine whether the correct legal standards were applied and "whether the Commissioner's findings are supported by substantial evidence in the record as a whole." *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir.1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th

---

[4](...continued)
*States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings, *see Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will *not* result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed *de novo*, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g.*, *United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions *de novo*." (citation omitted)).

Cir.1998). Under this deferential standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Page*, 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion.") (quoting *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999)). Even if the court would have "'weighed the evidence differently,'" the Commissioner's decision will not be disturbed unless "it falls outside the available 'zone of choice.'" *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)).

### III. PRELIMINARY MATTER: ADEQUACY OF LYNCH'S OBJECTION

In Defendant's Response to Plaintiff's Objections to the United States Magistrate Judge's Report and Recommendation (docket no. 17), the Commissioner objects to the court's consideration of Lynch's Objections to Report and Recommendation because it allegedly fails to reference any specific portion of the Report and Recommendation and fails to specify the basis for any objection. Local Rule 72.1 states, in pertinent part: "A party who objects to or seeks review or reconsideration of either a magistrate judge's order on a pretrial matter or a magistrate judge's report and recommendation must file specific, written objections to the order or report and recommendation within 14 days after service of the order or report and recommendation." N.D. IA. L.R. 72.1; *see also* FED. R. CIV. P. 72 ("Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations."). In addition, Judge Zoss's Report and Recommendation stated that, "[o]bjections must specify the parts of the report and recommendation to which objections

are made, as well as the parts of the record forming the basis for the objections." Docket no. 15, n.2 (citations omitted).

Lynch objects to Judge Zoss's finding that "the ALJ's decision to deny disability benefits is supported by substantial evidence." Docket no. 16. The only issue that Judge Zoss analyzed prior to making this finding was whether the ALJ performed a proper credibility assessment. The Report and Recommendation's analysis was confined to this one issue and was brief, and the court finds that Lynch sufficiently objected to the entire analysis portion of the Report and Recommendation. *See* 28 U.S.C. § 636(b)(1) ("If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). The court will, therefore, review *de novo* whether there was substantial evidence in the record as a whole to support the ALJ's/Commissioner's finding that Lynch was not disabled. However, and as stated above, Lynch did not object to Judge Zoss's factual findings, and the court has adopted them.

## IV. LEGAL ANALYSIS

Judge Zoss found that the ALJ's decision to deny benefits to Lynch was supported by substantial evidence on the record as a whole. According to Judge Zoss, the ALJ was permitted to determine whether Lynch's subjective claims were credible and the ALJ properly supported his credibility assessment with specific examples in the record. Lynch objects to Judge Zoss's finding and alleges that the following pages in the record form the basis for her objection: 5-7; 12-36; 139-47; 163-209; 219-44; 259-77; 284-86; 309-52; 353; 374-78; 381; and 405-06. Due to this objection, the court will review, *de novo*, the issue of whether the ALJ's decision to deny benefits was supported by substantial evidence

on the record as a whole. *See* 28 U.S.C. § 636 ("A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.").

The ALJ found that Lynch was not disabled. In coming to this conclusion, the ALJ found the following regarding Lynch's RFC:

> [C]laimant retains the residual functional capacity to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, push and/or pull weight consistent with her capacity for lifting and carrying, stand and/or walk (with normal breaks) for a total of at least two hours in an eight-hour workday, sit (with normal breaks) for a total of about six hours in an eight-hour workday, could never climb ladders, ropes, or scaffolds, could frequently climb ladders[5] or stairs, balance, stoop, kneel, crouch, and crawl, and would need to avoid even moderate exposure to workplace hazards such as dangerous moving machinery and unprotected heights.

R. at 18. The ALJ considered this RFC along with the VE's testimony in determining that Lynch was not disabled—the ALJ found that Lynch was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *See* R. at 36.

Lynch challenged two aspects of the ALJ's analysis when briefing the case for Judge Zoss. *See* docket no. 10 (Brief and Argument of Plaintiff). First, Lynch claimed that the ALJ should have found her subjective complaints credible—concerning her inability to work more than part-time and her inability to stand for more than ten minutes. If the ALJ

---

[5] Although the ALJ's RFC in his opinion stated that Lynch both "could never climb ladders" and "could frequently climb ladders," R. at 18, the ALJ's questioning of the VE and the VE's responses reflected that Lynch would not be expected to climb ladders. R. at 400 ("postural activities are occasional except no climbing of ladders").

would find these complaints credible, the ALJ's RFC would have been altered, *see* R. at 18, and the VE's testimony would support a finding that Lynch is disabled. *See* R. at 399. Second, Lynch claims that the ALJ improperly failed to consider her diminished sensation and limitations on working above and below her waist, as allegedly recognized in Lynch's FCE. If the ALJ gave the FCE additional weight, the ALJ's RFC would likely be altered—in accordance with the manipulative limitations—and the VE's testimony explained that such limitations would be a factor further limiting Lynch's ability to do sedentary work. *See* R. at 406. The court will address both of these arguments, in turn.

### A. Lynch's Subjective Complaints

Lynch claims that the ALJ erred in failing to assume the veracity of her subjective complaints. In *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), the Eighth Circuit Court of Appeals first articulated the standard for evaluating subjective complaints:

> In *Polaski*, we stated that the ALJ must consider the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
> *Id.* at 1322.

*Heino v. Astrue*, 578 F.3d 873, 880-81 (8th Cir. 2009). An ALJ is not, however, "free to accept or reject the claimant's subjective complaints solely on the basis of personal observations." *Id.* at 880. "Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Id.* (citing *Polaski*, 739 F.2d at 1322). "[Q]uestions of credibility are for the [ALJ] in the first instance. If an ALJ explicitly

discredits a claimant's testimony and gives a good reason for doing so, we will normally defer to that judgment." *Finch v. Astrue*, 547 F.3d 933, 935-936 (8th Cir. 2008) (quoting *Karlix v. Barnhart*, 457 F.3d 742, 748 (8th Cir.2006), in turn quoting *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir.1990)).

In this case, the ALJ cited the credibility factors in 20 C.F.R. §§ 404.1529 and 416.929 and discussed, in detail, the inconsistencies between Lynch's subjective complaints and the evidence as a whole. *See* R. at 19-34; *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) ("Although the ALJ never expressly cited *Polaski* (which is our preferred practice), the ALJ cited and conducted an analysis pursuant to 20 C.F.R. §§ 404.1529 and 416.929, which largely mirror the *Polaski* factors.") (citing *Randolph v. Barnhart*, 386 F.3d 835, 842 (8th Cir.2004)). For example, the ALJ found that Lynch's claim that her obesity and peripheral edema prevent her from full-time employment, and from standing for more than ten or fifteen minutes, was inconsistent with evidence that Lynch worked forty hours a week cleaning houses after her alleged onset date, *see* R. at 318, and with evidence that Lynch continued to clean houses as recently as March of 2007. *See* R. at 261. The record also reflects that Lynch was not good at follow-up appointments and was suspected of malingering, R. at 220 (Lynch "is not good at follow-up. She has missed at least 2 appointments since August. . . . I think she really came in today to get a note saying that she can't work."); R. at 220; R. at 274-75[6], and she failed to follow

---

[6] Milford Family Care Clinic Notes from February 16, 2007, state:
On examination the patient seems to feel that her right foot looks swollen and blue, however, in comparison to the other foot she only has about 1/2 to 3/4 cm difference and the discoloration does not seem apparent or obvious to me. . . . Before I even touch this patient she seems to anticipate pain

(continued...)

treatment advice recommended by medical professionals. R. at 174-75; R. at 172-73; R. at 328. The ALJ also noted that the record showed Lynch was able to care for herself without assistance from others.

The ALJ explicitly discredited Lynch's testimony concerning her subjective complaints about her inability to engage in full-time work and her inability to stand for more than 10 minutes, gave good reasons for discrediting the statements, and, as a result, the court will defer to the ALJ's judgment. *See Finch*, 547 F.3d 935-936 (citations omitted).

### B. Limitations From the Functional Capacity Evaluation

Lynch also alleges that the ALJ failed to consider the limitations identified in the FCE. Lynch claims that, according to her FCE, every aspect of the use of her hands is limited, and she argues that the ALJ improperly neglected to consider her splints, carpal

---

[6] (…continued)

> and jerks even when I lay the stethoscope on her back she jerks as if in pain. She also seems to have difficulty getting up on the examination table, however, when she comes down and walks to the chair that same pain does not seem apparent.
>
> . . . .
>
> I offered to refer this patent back to the University of Iowa and she refused that. Worth noting I told her that I would not be responsible for her negative outcomes and that the Flexeril she must cut back. I advised her that at such large doses she could easily be causing difficulties with her liver. This seems to be a somewhat difficult patient in that she seems fairly set on what she wants and I am uncertain if she is actually seeking the Flexeril for herself or possibly someone else.

R. at 274-75.

tunnel symptoms, and diminished sensation as shown on the FCE. The Commissioner claims that the record contains no evidence of medically determinable impairments that could reasonably be expected to produce Lynch's alleged manipulative limitations. The Commissioner also argues that the ALJ was not bound by the opinion of the physical therapist who administered the FCE.

"The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001) (citations omitted). The ALJ, however, still "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) (citing *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir.2000)).

The ALJ did not fail to consider the FCE, as Lynch suggests. Rather, he stated, concerning the FCE, that he:

> accepts that claimant would experience some symptoms and limitations associated with her impairments, particularly in regard to her ability to stand throughout a workday, and her residual functional capacity has been reduced accordingly to account for such. However, the evidence of record as a whole does not support that claimant possesses limitations which are so severe as to preclude the performance of all work activity.

R. at 32-33. The ALJ then stated that, "although the functional capacity evaluation cited a number of limitations in regard to upper extremity limitations, as previously discussed, the evidence is absent information documenting the existence of a medically determinable impairment which could reasonably be expected to cause the manipulative limitations described above." R. at 33.

The ALJ's RFC, which does not fully adopt the FCE's findings, is supported by substantial evidence in the record as a whole. Because the ALJ is not required to view

only the results of the FCE, but may also look at all of the relevant evidence, the ALJ can consider the activities that Lynch is able to perform despite the alleged manipulative limitations. *See Guilliams*, 393 F.3d at 803 ("The ALJ here relied on evidence in the record that suggested Guilliams was capable of considerable physical activity despite his carpal tunnel and other impairments."). The record details Lynch's manipulative abilities: Lynch claimed that she is able to roll things up her leg when she drops them on the floor, *see* R. at 384; Lynch was able to let her cats out, feed them, do laundry, watch television, and do the dishes during commercials, *see* R. at 211; and the ALJ found that Lynch could perform tasks such as preparing meals, feeding fish, birds, and hamsters, crocheting, doing laundry, shopping, paying bills, and performing some other housework. R. at 21. In addition, no doctor has recommended surgery for the carpal tunnel or any other causes of the manipulative limitations, nor has any doctor advised Lynch to limit her activities due to her condition. *See* R. at 384-85.

In light of the above findings, and a *de novo* review of the record, the court finds the ALJ's "findings are supported by substantial evidence in the record as a whole." *Page*, 484 F.3d at 1042. The ALJ proposed a hypothetical RFC to the VE—that was based on the Physical Residual Functional Capacity assessments completed by J.D. Wilson, M.D. (R. at 132-38) and Jan Hunter, D.O. (R. at 139-47)—and the VE testified that such an RFC would allow Lynch to perform sedentary work. *See* R. at 399-400.

## V.  CONCLUSION

THEREFORE, the court **accepts** Judge Zoss's Report and Recommendation (docket no. 15) in its entirety and **affirms** the Commissioner's decision that Lynch is not disabled.

**IT IS SO ORDERED.**

**DATED** this 13th day of January, 2010.

_Mark W. Bennett_
_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA